Citation Nr: 1542420 
Decision Date: 09/30/15 Archive Date: 10/05/15

DOCKET NO. 07-30 016 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in St. Petersburg, Florida


THE ISSUES

1. Entitlement to service connection for neuropathy of the upper extremities, to include as secondary to service-connected disabilities.

2. Entitlement to an evaluation in excess of 20 percent for the service-connected thoracolumbar spine disability prior to December 14, 2013, and to an evaluation in excess of 40 percent from that date.

3. Entitlement to a total disability rating based on individual unemployability (TDIU).


REPRESENTATION

Veteran represented by: The American Legion




ATTORNEY FOR THE BOARD

J. H. Nilon, Counsel


INTRODUCTION

The Veteran served on active duty from November 1973 to December 1975.

This matter comes before the Board of Veterans' appeals (Board) on appeal of an August 2001 rating decision by the Department of Veterans Affairs (VA) Regional Office (RO) in St. Petersburg, Florida that in relevant part increased the rating from 10 percent to 20 percent for the service-connected thoracolumbar spine disability and denied service connection for peripheral neuropathy.

In November 2013 the Board remanded the issues identified on the title page to the Agency of Original Jurisdiction (AOJ) for further development, which has been accomplished. Stegall v. West, 11 Vet. App. 268, 271 (1998).


FINDINGS OF FACT

1. The Veteran's peripheral neuropathy of the upper extremities was not etiologically related to service and was not proximately caused by or permanently worsened by a service-connected disability.

2. Prior to December 14, 2013, the Veteran's thoracolumbar spine disability was manifested by moderate limitation of motion, with flexion predominantly greater than 30 degrees and no ankylosis; he did not have intervertebral disc syndrome (IVDS) causing incapacitating episodes or recurring attacks with little relief.

3. From December 14, 2013, the Veteran's thoracolumbar spine has not been ankylosed and he has not been shown to have pronounced IVDS with any incapacitating episodes.
4. The Veteran's service-connected disabilities do not render him unable to obtain and maintain gainful employment.


CONCLUSIONS OF LAW

1. The requirements to entitlement to service connection for neuropathy of the upper extremities have not been met. 38 U.S.C.A. §§ 1131, 5107 (West 2014); 38 C.F.R. §§ 3.303, 3.310 (2015).

2. The requirements to establish entitlement to an evaluation in excess of 20 percent for the thoracolumbar spine disability prior to December 14, 2013, and to an evaluation in excess of 40 percent from that date, have not been met. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. § 4.71a, Diagnostic Code 5293 (2002); 38 C.F.R. § 4.71a, Diagnostic Codes 5289, 5292, 5293 (2003); 38 C.F.R. §§ 4.7, 4.40, 4.45, 4.71a, Diagnostic Codes 5237, 5242, 5243 (2015).
 
3. The requirements to establish entitlement to a TDIU have not been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.340, 3.341, 4.16 (2015).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Duties to Notify and Assist

Before addressing the merits of the claim on appeal, the Board is required to ensure that the VA's "duty to notify" and "duty to assist" obligations have been satisfied. See 38 U.S.C.A. §§ 5103, 5103A (West 2014); 38 C.F.R. § 3.159 (2015). 

Where there is a timing defect in a case, VA may cure the timing defect through compliance via proper remedial measures, such as the issuance of compliant VCAA notice followed by readjudication of the claim. Mayfield v. Nicholson, 444 F.3d 1328, 1333-34 (Fed. Cir. 2006). The readjudication may come in the form of the issuance of a SOC following the issuance of the VCAA notice. Mayfield v. Nicholson, 449 F.3d 1317, 1323-24 (Fed. Cir. 2007); Prickett v. Nicholson, 20 Vet. App. 370, 376-77 (2006). In this case, the Veteran was not provided complete notice of the elements required to establish entitlement to service connection prior to the August 2001 rating decision on appeal. Also, in its November 2013 action the Board determined that the Veteran had not received adequate notice in regard to his claim for TDIU. However, in December 2013 the AOJ provided the Veteran with VCAA-compliant noted in regard to all three issues on appeal (entitlement to service connection on a primary or secondary basis, entitlement to increased rating and entitlement to TDIU) and thereafter readjudicated the claim in September 2014. 

In any event, the Veteran has not identified any prejudice due to error in the content or timing of the notice provided. See Shinseki v. Sanders, 129 S.Ct.1696 (2009) (reversing prior case law imposing a presumption of prejudice on any notice deficiency, and clarifying that the burden of showing that an error is harmful, or prejudicial, normally falls upon the party attacking the agency's determination).

Concerning the duty to assist, the RO has obtained service treatment records, and has also obtained post-service treatment records from those VA and private medical providers identified by the Veteran. VA has also obtained the Veteran's Social Security Administration (SSA) disability file, and the RO obtained the Veteran's VA Vocational Rehabilitation file for consideration in support of his claim for TDIU. Neither the Veteran nor his representative has made the RO or the Board aware of any additional evidence that needs to be obtained in order to fairly decide this appeal. The Veteran has been advised of his entitlement to a hearing before the Board, but he declined such a hearing. 

During the course of the appeal the Veteran was afforded VA medical examinations in July 1999, May 2001, November 2006, July 2008, September 2009 and December 2013. The Veteran's representative submitted an Appellant Brief in July 2015 asking the Board to remand the case for new medical examination of the Veteran's spine, contending that the last examination in December 2013 had become too "stale" to be a valid basis for evaluation of the thoracolumbar spine disability or entitlement to TDIU. The Board disagrees. The passage of time alone, without an allegation of worsening, does not warrant a new examination. Palczewski v. Nicholson, 21 Vet. App. 174 (2007). In this case neither the Veteran nor his representative has asserted, and the medical treatment records associated with the file since the last examination do not suggest, that the Veteran's service-connected thoracolumbar spine disability has increased significantly in severity since that examination. Accordingly, remand for another examination is not warranted at this point. Palczewski, id. Regarding the claim for TDIU, the ultimate question of whether a veteran is capable of substantial gainful employment is not a medical one; rather, that assessment is for the adjudicator. Moore v. Nicholson, 21 Vet. App. 211, 218 (2007), rev'd on other grounds sub. nom. Moore v. Shinseki, 555 F.3d 1369 (Fed. Cir. 2009). The Board accordingly finds that remand for new medical examination is not warranted before the issues on appeal are adjudicated.

Based on a review of the claims file, the Board finds that there is no indication in the record that any additional evidence relevant to the issues to be decided herein is available and not part of the claims file. See Mayfield v. Nicholson, 499 F.3d 1317 (Fed. Cir. 2007). Therefore, the Board finds that duty to notify and duty to assist have been satisfied and will proceed to the merits of the issues on appeal.

Evidence and Analysis

The Board has reviewed all the evidence in the record. Although the Board has an obligation to provide adequate reasons and bases supporting this decision, there is no requirement that all the evidence submitted by the appellant or obtained on his behalf be discussed in detail. Rather, the Board's analysis below will focus specifically on what evidence is needed to substantiate the claim and what the evidence in the claims file shows, or fails to show, with respect to the claim. See Gonzales v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000); Timberlake v. Gober, 14 Vet. App. 122, 128-30 (2000).

Except as otherwise provided by law, a claimant has the responsibility to present and support a claim for benefits under the laws administered by VA. VA shall consider all information and medical and lay evidence of record. Where there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, VA shall give the benefit of the doubt to the claimant. 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102; see also Gilbert v. Derwinski, 1 Vet. App. 49, 53 (1990). To deny a claim on its merits, the evidence must preponderate against the claim. Alemany v. Brown, 9 Vet. App. 518, 519 (1996), citing Gilbert, 1 Vet. App. at 54.

Entitlement to Service Connection

Service connection may be established for a disability resulting from disease or injury incurred in or aggravated by service. 38 U.S.C.A. §§ 1110, 1131; 38 C.F.R. § 3.303. Regulations also provide that service connection may be granted for any disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disability was incurred in service. 38 C.F.R. § 3.303(d).

Generally, in order to prove service connection, there must be competent, credible evidence of (1) a current disability, (2) in-service incurrence or aggravation of an injury or disease, and (3) a nexus, or link, between the current disability and the in-service disease or injury. See, e.g., Davidson v. Shinseki, 581 F.3d 1313 (Fed. Cir. 2009); Pond v. West, 12 Vet. App. 341 (1999). 

Service connection may also be established for disability that is proximately due to or the result of a service-connected disability. 38 C.F.R. § 3.310(a) (2015). Further, a disability that is aggravated by a service-connected disability may be service-connected to the degree that the aggravation is shown. Allen v. Brown, 7 Vet. App. 439 (1995). However, VA will not concede that a nonservice-connected disease or injury was aggravated by a service-connected disease or injury unless the baseline level of severity of the nonservice-connected disease or injury is established by medical evidence created before the onset of aggravation or by the earliest medical evidence created at any time between the onset of aggravation and the receipt of medical evidence establishing the current level of severity of the nonservice- connected disease or injury. 38 C.F.R. § 3.310. 

Effective October 10, 2006, during the course of this appeal, VA amended 38 C.F.R. § 3.310 to implement the holding in Allen; however, under the facts of this case the regulatory change does not impact the outcome of the appeal. 
Service treatment records (STRs) show no complaints of pain or numbness in the upper extremities. The Veteran had a separation physical examination in August 1975 in which neurological evaluation and evaluation of the upper extremities was normal.

The Veteran had a VA compensation and pension (C&P) examination in January 1976; the examination report is entirely negative for any subjective or objective neurological abnormality of the upper extremities. He had a VA C&P examination of the spine in January 1994 in which examination of the upper extremities similarly revealed no abnormalities.

The Veteran presented to the VA outpatient clinic in April 1996 complaining of pain in the legs and arms; the clinical impression was possible peripheral neuropathy, and he was referred for follow-up to the neurology and rheumatology clinics. VA neurology clinic notes in June 1997 and August 1997 show complaints of numbness in stocking-and-glove pattern in both hands and in both feet, with clinical impression of peripheral sensory polyneuropathy. A treatment note in October 1997 cited "peripheral sensory polyneuropathy of unknown etiology." 

In November 1998 the Veteran submitted a claim for service connection for "loss of feeling" in the bilateral forearms as well as both feet. He had a VA C&P examination in July 1999 in which he complained of having developed burning and numbness in the hands over a 2-3 year period; he described a family history of diabetes mellitus (DM), and although the Veteran was not currently diagnosed with diabetes the examiner stated an impression that the Veteran's stocking-and-glove sensory neuropathy was likely related to early DM.

The Veteran had a Functional Capacity Evaluation (FCE) by VA in July 2000. The Veteran's grip strength was observed to have decreased between the morning and afternoon sessions, which was consistent with his subjective report of stiffness and "dead" feeling in both forearms, but the Veteran was also noted to be putting forth submaximal effort in grip tests. 

The Veteran had a VA C&P examination of the spine in May 2001 in which he reported pain and burning in his hands and feet; he reported a very strong family history of DM but denied having been told that he is diabetic. The examiner's diagnosis was "very strong possibility of diabetic peripheral neuropathy."

In December 2001 the Veteran presented to the VA neurology clinic complaining of numbness and burning pain in the upper and lower extremities for years. In March 2002 the attending neurologist noted that the Veteran had been identified as possibly positive for the human immunodeficiency virus (HIV); if confirmed this could explain the Veteran's distal symmetrical peripheral polyneuropathy, since such symptoms are common in HIV patients. A subsequent VA neurology treatment note in May 2002 states that the Veteran had been recently confirmed as HIV positive, and a VA neurology clinic note in December 2005 specifically notes an impression of "HIV neuropathy." A VA neurology clinic note in July 2006 refers to HIV-associated symmetric sensory (small and large fiber) peripheral polyneuropathy. A VA neurology clinic note in August 2006 notes the Veteran to be an HIV patient on highly active antiviral treatment (HAART) and having peripheral neuropathy.

The Veteran had a VA examination of the feet in October 2006 in support of his claim for service connection for a right ankle disability. The examiner stated an opinion that the Veteran's peripheral neuropathy of the lower extremities is most likely from his low back condition, since the Veteran does not have a documented history of DM or alcoholism. The examination did not address the upper extremities.

A July 2008 VA neurology treatment note states that the Veteran's lower extremity neuropathic symptoms were due to a combination of HIV neuropathy and lumbar spondylosis. The overall clinical impression was peripheral neuropathy likely secondary to HIV; the clinician also stated that the Veteran's prior syphilis treatment history needed to be clarified since this can also contribute to peripheral neuropathy.

The Veteran had a VA examination of the joints in July 2008, performed in support of his claim for increased rating for his service-connected right elbow disability. Examination of the right upper extremity showed decreased sensation in the hand and forearm and slightly decreased grip strength; the examiner's relevant diagnosis was peripheral neuropathy of the right upper extremity. The examiner also noted concurrent peripheral neuropathy in the upper and lower extremities secondary to HIV.

The Veteran had another VA joints examination in September 2009, again in support of his claim for increased rating for the right elbow disability. The examiner noted that EMG in February 2009 had shown evidence of sensory polyneuropathy of the lower extremities but no abnormalities in the upper extremities. On this occasion the examiner did not diagnose any peripheral neuropathy of the upper extremities.

A VA neurology clinic note in June 2010, associated with Virtual VA, states the Veteran has a history significant for HIV distal symmetrical sensory neuropathy, hypertension, hyperlipidemia, polysubstance abuse and syphilis. The Veteran had an 8-year history of symmetrical dysesthesias and paresthesias and was diagnosed with HIV sometime after the onset of these symptoms. The clinician performed sensory and motor examinations of the upper and lower extremities and noted observations in detail. The clinical impression was severe advanced-stage distal symmetrical neuropathy due to HIV, with symptoms stable.

The Veteran had a VA examination of the peripheral nerves in December 2013, performed by an examiner who reviewed the claims file. The Veteran reported that numbness in the legs and lower arms began shortly after release from service (the examiner noted the Veteran was discharged from service in 1975 and the first clinical notation of sensory neuropathy in the upper extremities was in 1995). The examiner noted that neurology notes from 2002 make the connection of the Veteran's peripheral neuropathy to his HIV infection. The examiner performed a clinical examination of the peripheral nerves and noted observations in detail. The examiner diagnosed peripheral nerve disease of the upper (and lower) extremities.

The examiner stated an opinion that the Veteran's peripheral neuropathy is not likely related to service or to a service-connected disability. The examiner noted that careful review of STRs did not show neuropathy in service, and symptoms of symmetrical dysesthesias and paresthesias began many years after service. The Veteran's symptoms are clinically related to HIV infection; in regard to the service-connected lumbosacral strain, this cannot cause or aggravate peripheral neuropathy of the upper extremities.

Review of the evidence above demonstrates that the Veteran is diagnosed with peripheral neuropathy of the upper extremities. Accordingly, the first element of service connection - medical evidence of a disability - is met. However, a veteran seeking disability benefits must establish not only the existence of a disability, but also an etiological connection between his military service and the disability. Boyer v. West, 210 F.3d 1351, 1353 (Fed. Cir. 2000); D'Amico v. West, 209 F.3d 1322, 1326 (Fed. Cir. 2000).

In this case the VA examiner provided a competent medical opinion that the Veteran's peripheral neuropathy of the upper extremities is not incurred in service and is not aggravated by his service-connected thoracolumbar spine disability. The examiner was demonstrably fully informed of the pertinent factual premises, and the examiner provided a fully-articulated opinion supported by a reasoned analysis; the examiner's opinion is accordingly probative and may be relied upon by the Board. See Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 303-304 (2008). Further, the examiner's opinion is consistent with the medical treatment notes associated with the file. 

The Board has considered the October 2006 VA foot examination, which states the Veteran's peripheral neuropathy is associated with the lumbar spine disability, but finds that this assessment was made by ruling out diabetic neuropathy or alcoholism; the foot examiner did not consider HIV-related neuropathy. Further, the foot examiner's opinion is refuted by the later opinion of the VA examiner in December 2013, who performed a detailed examination of both the spine and the peripheral nerves and whose detailed clinical rationale is more probative under the criteria of Nieves-Rodriguez cited above.
The Board has also considered the July 2008 VA neurology treatment note stating that the Veteran's lower extremity neuropathic symptoms were due to a combination of HIV neuropathy and lumbar spondylosis, which suggests that the claimed peripheral neuropathy may be due at least in part to the service-connected disability of the spine. However, the overall clinical impression on that occasion was peripheral neuropathy likely secondary to HIV, and all other neurology clinic notes refer to HIV-related neuropathy rather than to spinal peripheral neuropathy. The Board accordingly finds that the isolated treatment note in July 2008 does not show entitlement to service connection, given the weight of the other evidence.

The Veteran asserts on appeal that his claimed peripheral neuropathy of the upper extremities is due to or aggravated by his service-connected disability of the thoracolumbar spine. However, the Veteran is shown to have numerous health factors that are associated with neuropathy, including HIV infection, treatment for syphilis, morbid obesity, hypertension, hyperlipidemia, and history of polysubstance abuse. Accordingly, the etiology of the Veteran's neuropathic symptoms is a complex medical question that is not within his competence as a layperson. Jandreau v. Nicholson, 492 F. 3d 1372, 1377 (Fed. Cir. 2007). The Board assigns greater probative value to the opinion of the VA examiner. See Jones v. Brown, 7 Vet. App. 134, 137 (1994) (holding that it is the province of trained health care professionals to enter conclusions that require medical expertise, such as opinions as to diagnosis and causation). 

Based on the evidence and analysis above the Board finds the Veteran's peripheral neuropathy of the upper extremities was not etiologically related to service and was not proximately caused by or permanently worsened by a service-connected disability. Accordingly, the claim must be denied.

In reaching the above conclusion, the Board has considered the applicability of the benefit of the doubt doctrine. However, as the preponderance of the evidence is against the Veteran's claim, that doctrine is not applicable in the instant appeal. See 38 U.S.C.A. § 5107(b) (West 2014); Ortiz v. Principi, 274 F.3d 1361, 1364 (Fed. Cir. 2001); Gilbert, 1 Vet. App. 49, 55-56.

Evaluation of Disability

Disability evaluations are determined by the application of the VA's Schedule for Rating Disabilities (Rating Schedule), 38 C.F.R. Part 4 (2015). The percentage ratings contained in the Rating Schedule represent, as far as can be practicably determined, the average impairment in earning capacity resulting from diseases and injuries incurred or aggravated during military service and their residual conditions in civil occupations. 38 U.S.C.A. § 1155; 38 C.F.R. §§ 3.321(a), 4.1.

Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7.

It is not expected, especially with the more fully described grades of disabilities, that all cases will show all the findings specified; findings sufficiently characteristic to identify the disease and the disability therefrom are sufficient; and above all, a coordination of rating with impairment of function will be expected in all cases. 38 C.F.R. § 4.21.

When evaluating joint disabilities rated on the basis of limitation of motion, VA must consider granting a higher rating in cases in which functional loss due to pain, weakness, excess fatigability, or incoordination is demonstrated, and those factors are not contemplated in the relevant rating criteria. See 38 C.F.R. §§ 4.40, 4.45, 4.59; DeLuca v. Brown, 8 Vet. App. 202 (1995). In Mitchell v. Shinseki, 25 Vet. App. 32 (2011), the Court held that, although pain may cause a functional loss, "pain itself does not rise to the level of functional loss as contemplated by VA regulations applicable to the musculoskeletal system." Rather, pain may result in functional loss, but only if it limits the ability "to perform the normal working movements of the body with normal excursion, strength, speed, coordination, or endurance." Id., quoting 38 C.F.R. § 4.40.

Instead, the Mitchell Court explained that pursuant to 38 C.F.R. §§ 4.40 and 4.45, the possible manifestations of functional loss include decreased or abnormal excursion, strength, speed, coordination, or endurance, as well as less or more movement than is normal, weakened movement, excess fatigability, and pain on movement (as well as swelling, deformity, and atrophy) that affects stability, standing, and weight-bearing. See 38 C.F.R. §§ 4.40, 4.45. Thus, functional loss caused by pain must be rated at the same level as if the functional loss were caused by any of the other factors cited above. In evaluating the severity of a joint disability, VA must determine the overall functional impairment due to these factors.

The intent of the schedule is to recognize painful motion with joint or periarticular pathology as productive of disability. It is the intention to recognize actually painful, unstable, or malaligned joints, due to healed injury, as entitled to at least the minimum compensable rating for the joint. 38 C.F.R. § 4.59. The provisions of 38 C.F.R. § 4.59 cited above are not limited to arthritis and must be considered when raised by the claimant or when reasonably raised by the record. Burton v. Shinseki, 25 Vet. App. 1 (2011). 

The present claim for an increased rating was received in July 2000. The August 2001 rating decision assigned a 20 percent rating for service-connected residuals of lumbosacral spine strain effective from July 17, 2000 pursuant to Diagnostic Code (DC) 5295 (2000). In a December 2006 rating decision, the service-connected disability was recharacterized as the residuals of lumbosacral spine strain with degenerative disk disease at L4-L5. The 20 percent rating was continued, but was rated under DC 5237 (2003). A January 2014 rating decision increased the rating to 40 percent effective December 14, 2013 under DC 5237.

During the pendency of this claim, the criteria for evaluating disabilities of the spine were revised. VA's General Counsel, in a precedent opinion, has held that when a new regulation is issued while a claim is pending before VA, unless clearly specified otherwise, VA must apply the new provision to the claim from the effective date of the change as long as the application would not produce retroactive effects. VAOPGCPREC 7-2003 (Nov. 19, 2003). The revised criteria may only be applied as of their effective date and, before that time, only the former version of the regulation may be applied. VAOPGCPREC 3-2000 (Apr. 10, 2000). 
In accordance with VAOPGCPREC 7-2003, the Board has reviewed the revised rating criteria. The revised rating criteria would not produce retroactive effects since the revised provisions affect only entitlement to prospective benefits. Therefore, VA must apply the new provisions from their effective date. Thereafter, the rating criteria most favorable to the beneficiary will apply.

Under the criteria in effect prior to September 23, 2002, a rating of 10 percent is assigned for intervertebral disc syndrome (IVDS) that is mild. A rating of 20 percent is assigned for IVDS that is moderate, with recurring attacks. A rating of 40 percent is assigned for IVDS is severe with recurrent attacks and intermittent relief. A rating of 60 percent is assigned for pronounced IVDS with persistent symptoms compatible with sciatic neuropathy with characteristic pain and demonstrable muscle spasm, absent ankle jerk or other neurological findings appropriate to the site of the diseased disc, with little intermittent relief. 38 C.F.R. § 4.71a, DC 5293 (2002).

Under the interim revised criteria of DC 5293, effective September 23, 2002, IVDS is evaluated (preoperatively or postoperatively) either on the total duration of incapacitating episodes over the past 12 months, or by combining under 38 C.F.R. § 4.26 (combined rating tables) separate evaluations of its chronic orthopedic and neurologic manifestations along with evaluations for all other disabilities, which ever method results in the higher evaluation. A rating of 10 percent is assigned for incapacitating episodes having a total duration of one week but less than two weeks during the past 12 months. A rating of 20 percent is assigned for incapacitating episodes having a total duration of at least two weeks but less than four weeks during the past 12 months. A rating of 40 percent is assigned for incapacitating episodes having a total duration of at least four weeks but less than six weeks during the past 12 months. A rating of 60 percent is assigned when there are incapacitating episodes having a total duration of at least six weeks during the past 12 months. 38 C.F.R. § 4.71a, DC 5293 (2003).

For the purposes of evaluations under DC 5293, an "incapacitating episode" is a period of acute signs and symptoms due to intervertebral disc syndrome that requires bed rest prescribed by a physician and treatment by a physician. "Chronic orthopedic and neurological manifestations" means orthopedic and neurologic signs and symptoms resulting from intervertebral disc syndrome that are present constantly, or nearly so. Note 2 provides that when evaluating on the basis of chronic manifestations, evaluate orthopedic disabilities using evaluation criteria for the most appropriate orthopedic diagnostic code or codes. Evaluate neurological disabilities separately using evaluation criteria for the most appropriate neurological diagnostic code or codes. 38 C.F.R. § 4.71a, DC 5293, Note 1 (2003).

Under the criteria in effect prior to September 26, 2003, limitation of motion of the lumbar spine is rated under the criteria of DC 5292. Under these criteria, a rating of 10 percent is assigned for slight limitation of the lumbar spine, and a rating of 20 percent is assigned for moderate limitation of motion of the lumbar spine. A rating of 40 percent is assigned for severe limitation of motion of the lumbar spine. 38 C.F.R. § 4.71a, DC 5292 (2003).

Under the criteria in effect prior to September 26, 2003, lumbosacral strain was rated under DC 5295. A 20 percent rating was warranted for lumbosacral strain with muscle spasm on extreme forward bending, loss of lateral spine motion, unilateral, in standing position. A 40 percent rating was warranted for lumbosacral strain that was severe with listing of the whole spine to opposite side, positive Goldthwaite's sign, marked limitation of forward bending in standing position, loss of lateral motion with osteo-arthritic changes, or narrowing or irregularity of joint space, or some of the above with abnormal mobility on forced motion. 38 C.F.R. § 4.71a, DC 5295 (2003).

Under the criteria effective from September 26, 2003, lumbosacral or cervical strain and degenerative arthritis of the spine are evaluated under the general rating formula for rating diseases and injuries of the spine (outlined below). 38 C.F.R. § 4.71a, DCs 5237 and 5242 (2015). IVDS is evaluated under the general formula for rating diseases and injuries of the spine or under the formula for rating IVDS based on incapacitating episodes (outlined above), whichever method results in the higher evaluation when all disabilities are combined under 38 C.F.R. § 4.25. 38 C.F.R. § 4.71a, DC 5243 (2015).

Under the general rating formula for rating diseases and injuries of the spine, effective September 26, 2003, with or without symptoms such as pain, stiffness or aching in the area of the spine affected by residuals of injury or disease, the following ratings apply. 

A rating of 10 percent is assigned for forward flexion of the thoracolumbar spine greater than 60 degrees but not greater than 85 degrees; or, combined range of motion (ROM) of the thoracolumbar spine greater than 120 degrees but not greater than 235 degrees; or, localized tenderness not resulting in abnormal gait or abnormal spinal contour; or, vertebral body fracture with loss of 50 percent or more of the height.

A rating of 20 percent is assigned for forward flexion of the thoracolumbar spine greater than 30 degrees but not greater than 60 degrees; or, combined ROM of the thoracolumbar spine not greater than 130 degrees; or, muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis or abnormal kyphosis.

A rating of 40 percent is assigned for forward flexion of the thoracolumbar spine 30 degrees or less; or, favorable ankylosis of the entire thoracolumbar spine.

A rating of 50 percent is assigned for unfavorable ankylosis of the entire thoracolumbar spine, and a rating of 100 percent is assigned for unfavorable ankylosis of the entire spine. 

There are several notes set out after the diagnostic criteria, which provide the following: First, associated objective neurologic abnormalities are to be rated separately under an appropriate DC. Second, for purposes of VA compensation, normal forward flexion of the thoracolumbar spine is 0 to 90 degrees, extension is 0 to 30 degrees, left and right lateroflexion is 0 to 30 degrees, and left and right lateral rotation is 0 to 30 degrees. The combined ROM refers to the sum of the range of forward flexion, extension, left and right lateroflexion, and left and right rotation. The normal combined ROM of the thoracolumbar spine is to 240 degrees. Third, in exceptional cases, an examiner may state that, because of age, body habitus, neurologic disease, or other factors not the result of disease or injury of the spine, the ROM of the spine in a particular individual should be considered normal for that individual, even though it does not conform to the normal ROM stated in the regulation. Fourth, each ROM should be rounded to the nearest 5 degrees.

Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7.

A claimant may experience multiple distinct degrees of disability that might result in different levels of compensation from the time the increased rating claim was filed until a final decision is made. Thus, separate ratings can be assigned for separate periods of time based on the facts found - a practice known as "staged" ratings. Fenderson v. West, 12 Vet. App. 119 (1999); Hart v. Mansfield, 21 Vet. App. 505 (2007).

The Board issued a decision in November 2013 that granted service connection for peripheral neuropathy of the bilateral lower extremities as secondary to the thoracolumbar spine disability on appeal. A November 2013 rating decision assigned 10 percent ratings for the right and left lower extremities effective July 17, 2000. As the neurological impairment associated with the thoracolumbar disability is now appropriately compensated from the date of the Veteran's claim, the Board will not address lower extremity peripheral neuropathy in the discussion below.
 
Schedular evaluation prior to December 14, 2013

The Veteran had a VA C&P examination of the peripheral nerves in July 1999 in which he complained of pain radiating from the back to the buttocks, as well as stiffness and diminished ability to flex. Symptoms were aggravated by prolonged sitting, standing, lifting or bending. The examiner did not record ROM but noted diminished anterior mobility and tenderness in the left lower lumbar region. The Veteran has a wide-based, ataxic gait with a definite proprioceptive component. The examiner characterized the Veteran's back problem as a chronic lumbar sprain condition with some mechanical findings. 

The Veteran also had a VA C&P examination of the spine in July 1999, in which he complained of back pain with bending, lifting or jumping. The examiner did not record ROM; based on recent magnetic resonance imaging (MRI) the examiner diagnosed degenerative disc disease (DDD) of the lumbar spine.

The Veteran had an FCE by VA in July 2000 in which he complained of constant radiating back pain. The examiner observed the Veteran to walk with no signs of distress; his posture showed normal spinal curvature. Lumbar forward flexion was limited to fingertips 10 inches from the floor; otherwise spinal ROM was normal through all planes. 

The Veteran had a CA C&P examination of the spine in May 2001 in which he complained of pain in the lower back associated with prolonged standing or sitting; the pain radiated to his legs and feet. Physical examination showed no reflex or motor deficits in the lower extremities. There was diminished sensation in the left L4, L5 and S1 nerve root. Straight leg raising (SLR) was negative. ROM was flexion to 25 degrees, right and left bending to 20 degrees and extension to 10 degrees; rotation was not recorded. The examiner's diagnosis was probable DDD of the lumbar spine. 

The Veteran presented to the VA neurology clinic in January 2005 complaining of a recent episode of low back pain while getting out of a car; he also reported having had radiating back pain for several years. The Veteran denied weakness, sensory loss of bowel or bladder changes. The clinical impression was low back pain without evidence of myelopathy or radicular involvement. The clinician noted that MRI in 2002 had shown a small herniated disc at L4-L5, and requested a current MRI to evaluate the progression or worsening of DDD; MRI in February 2005 confirmed a small herniated disc at L4-L5. Subsequent VA neurology follow-up in August 2005 noted there had been essentially no change in subjective complaints or clinical observations since the previous consultation. 

The Veteran had a VA C&P examination of the joints and the spine in November 2006 performed by a physician who reviewed the claims file. The Veteran complained of current intermittent low back pain with intermittent radiation down both lower extremities. Flare-up of pain was precipitated by prolonged sitting, walking or bending; flare-ups were attended by stiffness and limitation of motion but the examiner was unable to estimate the degree of lost function during flare-ups. The Veteran denied bowel or bladder symptoms. The Veteran reported managing his back pain with ibuprofen and by occasionally using a back brace and stated that his low back pain did not interfere with his activities of daily living (ADLs). Examination showed the Veteran to walk with normal gait. The lumbar spine was straight and had slight tenderness over L4, L5 and S1. ROM showed forward flexion to 0-50 degrees, extension to 15 degrees, and left and right lateral flexion and rotation each to 20 degrees (combined ROM 145 degrees). There was pain toward the last few degrees of all motions. Repetitive motion did not produce additional limitation of motion due to pain, weakness, fatigue, lack or endurance or incoordination. The examiner noted recent X-ray in October 2006 (showing no bony pathology of the lumbar spine) and recent MRI in February 2005 (showing mild congenital lumbar spine stenosis and degenerative disease of the lumbar spine most prominent at the L4-L5 level with broad central/left disc herniation resulting in moderate central canal stenosis and possible compression of the left L5 nerve root). The examiner diagnosed DDD of the lumbosacral spine, most prominent at L4-L5 with moderate central canal stenosis by MRI.
 
VA MRI of the lumbar spine in October 2010 showed no spinal canal or foraminal stenosis and no change since 2005.

The Veteran had a VA C&P examination of the spine in June 2011, performed by an examiner who reviewed the claims file. The Veteran complained of increasing pain and stiffness in the lower back; he denied interval treatment, physical therapy or injections. Oral pain medications provided only fair relief. The Veteran denied bowel or bladder problems or erectile dysfunction and denied numbness, paresthesias, falls or unsteadiness. The Veteran described his pain as constant, moderate, sharp and radiating into both legs; he also complained of weakness, stiffness, spasms and decreased motion. He denied incapacitating episodes of IVDS and stated he could walk 1-3 miles. Physical examination showed normal posture and appearance, normal gait and normal spine contour, without ankylosis. The paraspinal muscles showed pain, tenderness and guarding but no atrophy, spasm or weakness. ROM was flexion 0-80 degrees, extension 0-30 degrees and all other motions (left and right lateral flexion and left and right lateral rotation) 0-30 degrees (combined ROM 230 degrees). There was pain on motion and pain with repetitive motion, but repetitive motion did not cause additional limitation of ROM. Neurological examination was grossly normal. The examiner diagnosed lumbar strain and stated that the impairment of ADLs associated with the disability was poor mobility due to pain. 
 
Clinical treatment records associated with Virtual VA show the Veteran presented to the VA pain clinic in November 2013 complaining of low back pain and leg pain. The Veteran had a recent steroid injection in October 2013 that had decreased his back pain to 90 percent. Examination showed the Veteran to have normal gait without limping. The spine was not painful with extension but ROM was not recorded. The clinical impression was chronic low back pain (CLBP) of multifactorial etiology including herniated disc and spondylosis, significantly improved with recent bilateral L5-S1 steroid injections. The examiner noted there were no neurological deficits; the Veteran's complaint of buckling of the legs was likely related to peripheral neuropathy and deconditioning as there was no indication in MRI of any spinal cord compression and no sign of cauda equina. 

On review of the evidence above, the Board finds that prior to December 14, 2013, the Veteran's disability more closely approximated the criteria for the currently-assigned 20 percent disability rating. 

Applying first the rating criteria for limitation of ROM, a rating higher than 20 percent is predicated on severe limitation of motion (DC 5292 prior to September 2003); severe lumbosacral strain with listing of the whole spine to opposite side, positive Goldthwaite's sign, marked limitation of forward bending in standing position, loss of lateral motion with osteo-arthritic changes, or narrowing or irregularity of joint space, or some of the above with abnormal mobility on forced motion (DC 5295 prior to September 2003); or forward flexion of the thoracolumbar spine 30 degrees or less or favorable ankylosis of the entire thoracolumbar spine (General rating formula from September 2003). In this case the Veteran had flexion to just 25 degrees in May 2001, but otherwise his flexion was greater than 30 degrees before and after that date (fingertips within 10 inches of the floor in in July 2000, and flexion to 50 degrees in November 2006 and to 80 degrees in June 2011). The Veteran's combined ROM was 145 degrees in November 2006 and 230 degrees in June 2011, as compared to normal combined ROM of 240 degrees, and the Veteran's spine was not ankylosed. In all cases the Veteran did not show significant additional loss of function or motion due to pain, fatigability, weakness or incoordination on repetitive motion. The Board finds that the Veteran's limitation of motion more closely approximated moderate, rather than severe, limitation of motion under the criteria of DC 5292, and that the Veteran's flexion was predominantly greater than 30 degrees. Accordingly, the criteria for rating higher than 20 percent based on limitation of motion were not met.

Further, the criteria for rating higher than 20 percent under DC 5295 is not warranted because symptomatology consistent with severe lumbosacral strain with listing of the whole spine to opposite side, positive Goldthwaite's sign, marked limitation of forward bending in standing position, loss of lateral motion with osteo-arthritic changes, or narrowing or irregularity of joint space, or some of the above with abnormal mobility on forced motion were not shown.

Applying next the rating criteria for IVDS, a rating higher than 20 percent is predicated on severe IVDS with recurrent attacks and intermittent relief (DC 5293 prior to September 2002) or IVDS resulting in incapacitating episodes having a total duration of at least four weeks but less than six weeks during the past 12 months (DC 5293 from September 2002 and DC 5243 from September 2003). In this case the Veteran is not shown to have had any qualifying incapacitating episodes or recurrent attacks of IVDS on which a rating higher than 20 percent may be considered under either the old or new rating criteria. 

Based on the analysis above the Board finds the criteria for a schedular rating higher than 20 percent prior to December 14, 2013, were not met.

Schedular evaluation from December 14, 2013

The Veteran's most recent VA C&P examination was performed in December 2013 by an examiner who reviewed the claims file. The Veteran complained primarily of pain and weakness in the legs; his back pain had been relived approximately 80 percent by steroid injections. The Veteran denied bowel or bladder impairment. The Veteran reported a flare-up one year before in which he was "on the floor for two weeks" (the examiner noted that this was not documented in treatment records) and stated that during flare-up he would have 0 degrees of flexion. The Veteran endorsed regularly using a brace or cane. Physical examination showed ROM of flexion to 5 degrees; extension to 10 degrees; right lateral flexion to 10 degrees; left lateral flexion to 15 degrees; and, right and left lateral rotation each to 20 degrees (combined ROM 90 degrees). Objective indication of pain was at the end point indicated. The examiner indicated that the Veteran's ROM did not conform to normal due to his increased body habitus. Repetitive motion actually caused no change in flexion, extension or right lateral flexion but caused improvement in left lateral flexion (15 degrees) and in left and right lateral rotation (25 degrees each). Although repetitive movement caused no additional limitation of ROM it did cause less movement than normal, pain on movement and interference with sitting, standing or weight-bearing. There was no spasm or guarding resulting in abnormal gait or spinal contour. The spine was not ankylosed. Motor strength examination was normal; reflexes and sensory were absent in the lower extremities. SLR was positive. There was no radicular pain or any other signs or symptoms due to radiculopathy and there were no other neurologic abnormalities or findings. The Veteran did not have IVDS. 

The examiner diagnosed lumbosacral strain. The examiner stated the Veteran's bilateral lower extremity symptoms were diffuse and did not follow a root distribution or correlate with imaging; therefore the Veteran did not appear to have radiculopathy but rather had polyneuropathy.

Clinical treatment records associated with Virtual VA show the Veteran presented to the VA pain clinic in July 2014 complaining of continued and increasing low back pain that was multifactorial, related to DDD of the lumbar spine and also to peripheral neuropathy of the lower extremities. Medications were not providing the same degree of relief as before. The Veteran had a series of nerve blocks and steroid injections that provided only transient relief, and acupuncture actually increased the pain. Physical examination showed the Veteran to walk without a limp but he was deconditioned. The Veteran declined ROM examination, citing pain. MRI showed patent canal and foramina with no neural compression, unchanged since 2005. The clinical assessment was CLBP of multifactorial etiology, pain in the lower extremities related to HIV peripheral neuropathy and no neurological defect.

On review of the evidence above, the Board finds that from December 14, 2013, the Veteran's disability has more closely approximated the criteria for the currently-assigned 40 percent disability rating.

Applying first the rating criteria for limitation of ROM, a 40 percent rating is the highest schedular rating available under DC 5290, 5292 (2003). Under the General Rating Formula in effect since September 2003, a rating higher than 40 percent is predicated unfavorable ankylosis of the entire thoracolumbar spine (50 percent rating) or unfavorable ankylosis of the entire spine (100 percent). In this case the Veteran's spine is not ankylosed, so a rating higher than 40 percent may not be assigned.

Turning to the rating criteria for IVDS, a rating higher than 40 percent is predicated on pronounced IVDS with persistent symptoms compatible with sciatic neuropathy with characteristic pain and demonstrable muscle spasm, absent ankle jerk or other neurological findings appropriate to the site of the diseased disc, with little intermittent relief (DC 5293 prior to September 2002) or on IVDS resulting in incapacitating episodes having a total duration of at least six weeks during the past 12 months (DC 5293 from September 2002 and DC 5243 from September 2003 ). In this case the VA examiner specifically found the Veteran does not have IVDS, and in any event the Veteran is not shown to have qualifying persistent symptoms compatible with sciatic neuropathy; in that regard the Veteran is not shown to have lower extremity weakness, impairment of bowel or bladder, or indeed to have peripheral radiculopathy related to the spine. 
Based on the analysis above the Board finds the criteria for a schedular rating higher than 40 percent from December 14, 2013, have not been met.

Other rating considerations

The Board has considered whether the Veteran's disability before or after December 14, 2013, presents an exceptional or unusual disability picture as to render impractical the application of the regular schedular standards such that referral to the appropriate officials for consideration of extra-schedular ratings is warranted. See 38 C.F.R. § 3.321(b)(1) (2015); Bagwell v. Brown, 9 Vet. App. 337, 338-39 (1996). The threshold factor is whether the disability picture presented in the record is adequately contemplated by the rating schedule. Thun v. Peake, 22 Vet. App. 111, 118 (2008). 

Here, the rating criteria reasonably describe the Veteran's disability level and symptomatology and provide for additional or more severe symptoms than currently shown by the evidence; thus, his disability picture is contemplated by the rating schedule, and the assigned schedular evaluation is, therefore, adequate. Id. at 115. 

The Veteran's disability of the thoracolumbar spine is manifested by signs and symptoms such as pain and weakness, which impairs his ability to carry weight and to perform tasks requiring full ROM. For all musculoskeletal disabilities, the rating schedule contemplates functional loss, which may be manifested by, for example, decreased or abnormal excursion, strength, speed, coordination, or endurance. 38 C.F.R. § 4.40 (2014); Mitchell, 25 Vet. App. 32, 37. For disabilities of the joints in particular, the rating schedule specifically contemplates factors such as weakened movement; excess fatigability; pain on movement; disturbance of locomotion; and interference with sitting, standing, and weight bearing. 38 C.F.R. §§ 4.45, 4.59; Mitchell, 25 Vet. App. at 37. 

Thus, the schedular criteria for musculoskeletal disabilities contemplate a wide variety of manifestations of functional loss. Given the variety of ways in which the rating schedule contemplates functional loss for musculoskeletal disabilities, the Board concludes that the schedular rating criteria reasonably describe the Veteran's thoracolumbar spine disability picture as described in his correspondence to VA, his statements to various medical examiners and the examination findings. In short, there is nothing exceptional or unusual about the Veteran's low back disability because the rating criteria reasonably describe his disability level and symptomatology. Thun, 22 Vet. App. at 115. Accordingly, referral for extraschedular consideration for the disability is not warranted.

Based on the evidence and analysis above the Board finds the criteria for a rating higher than 20 percent for the Veteran's thoracolumbar spine disability prior to December 14, 2013, and to an evaluation in excess of 40 percent from that date are not met. Accordingly, the claim must be denied.

Because the preponderance of the evidence is against the claim the benefit-of-the-doubt doctrine does not apply. Gilbert, 1 Vet. App. 49, 55; Ortiz, 274 F.3d 1361. 

Entitlement to TDIU

It is the established policy of VA that all veterans who are unable to secure and follow a substantially gainful occupation by reason of service-connected disabilities shall be rated totally disabled. 38 C.F.R. § 4.16 (2015). A finding of total disability is appropriate, "when there is present any impairment of mind or body which is sufficient to render it impossible for the average person to follow a substantially gainful occupation." 38 C.F.R. §§ 3.340(a)(1), 4.15 (2015).

A TDIU may be assigned, if the schedular rating is less than total, when the disabled person is, in the judgment of the rating agency, unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities, provided that if there is only one such disability it is ratable at 60 percent or more, and that if there are two or more such disabilities at least one is ratable at 40 percent or more and the combined rating is 70 percent or more. 38 C.F.R. § 4.16(a) (2015).

The Veteran in this case has the following service-connected disabilities: the thoracolumbar spine disability discussed above, rating at 20 percent prior to December 14, 2003, and at 40 percent from that date; peripheral neuropathy of the right lower extremity, rated at 10 percent; peripheral neuropathy of the left lower extremity, rated at 10 percent; a right elbow disability rated at 10 percent; and a right foot disability rated as noncompensable. His combined evaluation was 40 percent prior to December 14, 2013, and has been 60 percent from that date. Accordingly, he does not meet the threshold criteria for TDIU under 4.16(a) cited above. 

However, because it is the established policy of VA that all veterans who are unable to secure and follow a substantially gainful occupation by reason of service-connected disabilities shall be rated as totally disabled, the file may be submitted to the Director of Compensation Services for extra-schedular consideration if the Veteran is found to be unemployable by reason of service-connected disabilities even though he may fail to meet the percentage standards set forth in 38 C.F.R. § 4.16(a). See 38 C.F.R. § 4.16(b) (2015). 

For a veteran to prevail on a TDIU claim, the record must reflect some factor that takes the claimant's case outside the norm. The sole fact that a veteran is unemployed or has difficulty finding employment is not enough, since a high rating in itself is recognition that the impairment makes it difficult to obtain and keep employment; the question is whether the claimant is capable of performing the physical and mental acts required for employment, not whether the claimant can find employment. See Van Hoose v. Brown, 4 Vet. App. 361, 363 (1993). 

Consideration may be given to a veteran's education, training, and special work experience, but not to his age or to impairment caused by nonservice-connected disabilities. See 38 C.F.R. §§ 3.341, 4.16, 4.19 (2015).

The present claim for TDIU arises from a claim for increased rating that was received in July 2000.

The Veteran had a Functional Capacity Evaluation (FCE) by VA in July 2000 for the physician's use in filling out documentation of disability. The Veteran reported having been unemployed for the past year; before that he had been an airport shuttle driver before being laid off by his employer. His previous employment had been in landscaping for about 10 years. The Veteran stated he was currently enrolled in a 2-year Community College program for electrical engineering, with two semesters remaining. The examiner had the Veteran perform a number of physical movements including standing, sitting, bending, crouching, kneeling, crawling, pushing, pulling, overhead activity, etc. The examiner stated the Veteran put forth reasonable effort but could have performed at a higher level in some of the tasks, as shown by inconsistent performance in various activities. The examiner stated the Veteran appeared to be generally capable of performing work through the sedentary, light and medium work categories and appeared to be able to lift 70 pounds from floor to waist and 30 pounds to above-shoulder height. 

The file contains a Metro-Dade Office of Community Services Disability Statement that was apparently executed on the Veteran's behalf by a clinician at VA in May 2002. Significant diagnoses were HIV positive, gastroesophageal reflux disease (GERD), hypertension, peripheral neuropathy and herniated nucleus pulposus (HNP) in the lumbosacral spine; significant symptoms were paresthesias of the hands and feet. The clinician stated the Veteran was capable of clerical/sedentary activity.

The Veteran had a Physical Residual Functional Capacity Assessment (PRFCA) in June 2002 in support of his request for Social Security Administration (SSA) disability benefits. The PRFCA measured the Veteran's capacity to push/pull, stand, sit, lift, carry, manipulate and otherwise perform workplace-related tasks, and essentially determined the Veteran to be physically capable of performing occupational tasks. 

In August 2005 the Veteran reported to a VA neurologist that he planned to enroll in an educational program for electrical engineering. In November 2005 he reported to a VA clinician that he had started school but dropped out due to difficulties related to his HIV medications.

A decision by the Social Security Administration (SSA) in September 2006 denied the Veteran's claim for disability benefits, based on a determination that he was not shown to be disabled.
 
The Veteran had a VA C&P examination of the joints and the spine in November 2006, during which he informed the examiner that he worked in landscaping until beginning his studies in electronics five years earlier. The Veteran stated he hoped to graduate soon.

The Veteran had a VA examination of the joints in July 2008 in which he stated he had not worked since 2001 due to low back pain and peripheral neuritis; before that he had worked in landscaping and as a shuttle bus driver. 

In July 2009 a VA physician specializing in infectious diseases issued a letter stating that the Veteran's medical problems included hypertension, obesity, sleep apnea, dyspnea on exertion and chronic lower extremity pain that was associated with chronic HIV infection; there was also X-ray evidence of spinal stenosis and herniated disc. The Veteran also had a significant problem in the past due to cocaine addiction. The physician stated the Veteran was considered to be disabled from work based on his chronic pain, his documented chronic obstructive pulmonary disease (COPD) and his morbid obesity. 

The Veteran had a VA examination of the joints in September 2009 in which he reported that he had worked in the Safety Department of the VA Medical Center (VAMC) until two weeks earlier, but had to quit because of his medical problems.

The Veteran's most recent VA C&P examination was performed in December 2013, during which he reported he last worked as a shuttle driver in 2003 and was now in school fulltime to be an electrician.

The Veteran submitted a VA Form 21-4192 (Request for Employment Information) in April 2014, stating he had last worked full time in April 2001, as a driver, and that he was no longer working in that capacity in order to attend school full time.

Review of the Veteran's VA education file shows he was recently enrolled in courses at Miami-Dade Community College, for which he received financial assistance under a VA individual written rehabilitation plan (IWRP). The stated objective of the course was to obtain and maintain employment in the occupational field of electrical engineering or related field; anticipated course completion date was in April 2015. In accepting the Veteran into the program, a VA vocational manager determined in December 2011 that the objective of electronic engineer would entail reasonably sedentary work within the Veteran's limits and abilities.

The evidence above does not show the Veteran to be unemployable due to his service-connected disabilities. Although the Veteran asserts having been too disabled to work since April 2001, there is ample evidence since that date showing the Veteran to be capable of at least sedentary employment (Metro-Dade Office of Community Services Disability Statement in May 2002, SSA PRFCA in June 2002 and VA vocational manager determination in December 2011). The VA infectious diseases specialist stated in July 2009 that the Veteran was too disabled to work, but the physician based this determination on nonservice-connected COPD, nonservice-connected morbid obesity and on chronic pain (citing spinal stenosis and herniated disc on X-ray but also citing chronic lower extremity pain associated with chronic HIV infection). In sum, even if the Veteran is conceded to be unemployable, there is no credible evidence suggesting that such unemployability is due to his service-connected disabilities.

Based on the evidence and analysis above the Board finds the criteria for entitlement to a TDIU are not met. Accordingly, the claim must be denied.

Because the preponderance of the evidence is against the claim the benefit-of-the-doubt doctrine does not apply. Gilbert, 1 Vet. App. 49, 55; Ortiz, 274 F.3d 1361. 









 (CONTINUED ON NEXT PAGE)
ORDER

Service connection for neuropathy of the upper extremities is denied.

An evaluation in excess of 20 percent for the thoracolumbar spine disability prior to December 14, 2013, and an evaluation in excess of 40 percent from that date, is denied.

Entitlement to a TDIU is denied.




____________________________________________
S. HENEKS
Acting Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs